NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| K.K., on behalf of K.S., a minor child,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No.: 17-2309 (JLL)<br><br>OPINION |

**LINARES**, Chief District Judge.

This matter comes before the Court upon the appeal of Plaintiff K.K, on behalf of K.S., a minor child, from the final decision of Administrative Law Judge ("ALJ") Dennis O'Leary, denying Plaintiff's application for Supplemental Security Income ("SSI"). (ECF No. 1). The Commissioner of Social Security ("the Commissioner") has opposed Plaintiff's appeal. (ECF No. 12). After careful consideration of the administrative record and the parties' briefs, the Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court vacates and remands the ALJ's decision in accordance with the guidance herein.

### I. BACKGROUND[1]

**A. Factual History**

In 2006, Dr. Bruce Schweiger at Trinitas Hospital diagnosed K.S. with attention deficit hyperactivity disorder ("ADHD") and separation anxiety. (R. at 375). Plaintiff had brought K.S.

---

[1] "R." refers to the Administrative Record, which uses continuous pagination and can be found at ECF No. 5.

to the hospital because K.S. was having trouble concentrating and experiencing tremendous anxiety. (R. at 373). Dr. Schweiger hypothesized that K.S.'s development was hindered because she was methadone positive at birth. (R. at 375). At the time of Dr. Schweiger's evaluation, K.S. was in first grade, and her mother had just been away for treatment for substance abuse. (R. at 373). When K.S.'s mother returned home, K.S. had difficulty attending school and became very upset whenever she separated from her mother. (R. at 373). Dr. Schweiger prescribed Concerta for K.S.'s ADHD and recommended individual therapy for the separation anxiety. (R. at 375). In December of 2007, K.S. was prescribed Clinadine because she had trouble sleeping. (R. at 289). K.S.'s anxiety got worse, and in June 2012, Dr. Hermann prescribed K.S. Zoloft to help her cope with her anxiety. (R. at 410). Dr. Hermann eventually had to increase the dosage of Zoloft to help K.S. with stomach cramps, which he determined were a manifestation of her anxiety. (R. at 411). These medications caused various side effects, including loss of appetite, jitters, and headaches. (R. 469–71). K.S. is not taking any medications at present. (R. at 470). In a 2016 psychological evaluation, Dr. Slyker diagnosed K.S. with Post-Traumatic Stress Disorder ("PTSD"). (R. at 744). He noted that K.S. has a limited ability to engage socially, has poor social and verbal communication skills, exhibits withdrawn behavior, and is "vulnerable to exploitation, manipulation, and actual physical harm, given her current infantile level of maturity." (R. at 744). K.S. has testified that she feels sad because she is not as smart as the other students in her classes, that she gets nervous when she feels like people are looking at her, and does not like being on public buses for that reason. (R. at 483–85).

K.S. has a long history of educational and intellectual difficulties associated with her ADHD and anxiety. K.S. has been held back three times, repeating first grade once and second grade twice. (R. at 290, 458). The Irvington Board of Education then evaluated K.S. to see if she

qualified for special education services. (R. at 290–95). The evaluators found that Katrina performed well in math, but that her "overall level of achievement" was low, largely due to poor or very poor performance in categories relating to reading and writing. (R. at 295). In third grade, K.S. began receiving special education. (R. at 311). To date, K.S.'s schooling has included some degree of special education or accommodation, moving from self-contained special education classrooms to mainstream classrooms with various accommodations as she got older. (R. at 349–64, 377–97, 637–716, 719–20).

K.S.'s most recent Individualized Education Program ("IEP"), dated March 14, 2016, covering 9th and 10th grades, indicates that K.S. still qualifies as a special education student and lists attention deficit disorder as a disability. (R. at 719–20). The IEP shows that K.S. receives special education services in Language Arts Literacy, Math, Science, and Social Studies. (R. at 720). K.S. spends roughly 11 hours per week with these remedial support resources. (R. at 720). K.S.'s broad achievement scores on her educational evaluation ranged from low/low average to very low. (R. at 721). The examiner noted that K.S. "was not easily engaged in conversation and seemed guarded in all of her responses, but did provide asked for information and appropriately answered questions." (R. at 721).

In the IEP, K.S.'s teachers document her academic struggles. K.S.'s English teacher wrote that K.S. "appears to have a lack of ability in that she does not read and does not comprehend what she is reading. . . . She struggles with any assignment where she has to make inferences (logical guess work), comprehend a text, or cite evidence and explain her response – which is 99% of the class work." (R. at 723). K.S.'s English teacher also noted that K.S. cannot work independently in class and does not do her homework. (R. at 723). With respect to her writing assignments, K.S. would copy the work of her peers, but again experienced significant difficulties when asked to

work on her own. (R. at 724). K.S. experienced similar problems in her Science class, where she "arrived with a fear for Sciences, [and] a sense of helplessness." (R. at 726). Her Science teacher observed that "any type of written assignments appears [sic] to be very difficult for her to complete, not only due to her slowed speed but also due to her inability to formulate a sentence." (R. at 726). Furthermore, if K.S.'s teachers push K.S. to do work on her own, she reportedly "shuts down" or will walk out of the classroom. (R. at 461–62).

K.S.'s IQ scores and standardized testing scores corroborate her struggles in school. In May of 2009, when K.S. was 10 years old and repeating second grade, an Irvington Board of Education examiner administered the Woodcock Johnson Standard Achievement Battery ("WJ-III"). (R. at 292). In the Broad Reading category, K.S. scored 71, which put her at a first grade level. (R. at 292). The examiner noted her reading skills were "severely delayed." (R. at 292). K.S.'s Oral Language scores were in the low average range and her Written Language score was at a 1.6 grade level equivalent. (R. at 293). Finally, her Academic Knowledge score placed her at a K.9 grade level and was within the "borderline range" for her grade. (R. at 293). K.S. took the WJ-III again in March of 2014, when she was nearly 16 years old and halfway through eighth grade. (R. at 689–90). Her Broad Reading Score was 76, again in the low-average range, putting her at a grade level of 4.2. (R. at 690). Her Broad Written Language score was 62, placing her in the very low range, and her Broad Math score was 79, which put her skills at a fifth grade level and put her in the "low/low average" achievement range. (R. at 691–92). Finally, K.S. scored well below grade level on her 2015 PARCC Assessment Report, which tests English language and literacy skills, (R. at 635–36), and her functional assessment from 2015 showed that Katrina placed in the very low, low, or low-average ranges across 10 of 12 possible scores, (R. at 690–92).

4

Three separate psychiatric professionals also administered IQ tests to K.S. In 2009, K.S. achieved a Full Scale IQ score of 73, and scores of 75, 71, 71, and 100 in the categories of Verbal Comprehension, Perceptual Reasoning, Working Memory, and Processing Speed, respectively. (R. at 301). All of those scores placed her in the "borderline" range, except for her Processing Speed score, which was average. (R. at 301). In 2011, K.S. achieved a Full Scale IQ score of 49, and scores of 53, 55, 59, and 68 in the categories of Verbal Comprehension, Perceptual Reasoning, Working Memory, and Processing Speed, respectively. (R. at 368). K.S's Full Scale IQ score placed her in "the moderate range of mental retardation." (R. at 368). Her most recent IQ test, administered in August of 2016, produced a Full Scale IQ score of 76, and Nonverbal and Verbal IQ scores of 83 and 71, respectively. (R. at 743). These scores placed her in the "low end of the borderline range of intellectual functioning." (R. at 744).

However, K.S. does not struggle universally. For example, her Math score on the May 2009 WJ-III was 114, at 3.7 grade equivalent level, placing her slightly above the average. (R. at 292–93). In her sixth grade IEP, her Science teacher described her as a "very smart young lady," who "has turned in some excellent projects" and "gets along well with her peers and is often the go to person when the other students in the class needs [sic] help." (R. at 644). Her most recent IEP also indicated that she "is doing well in some respects," for example, in her Math and Japanese classes, that her behavior is good, and that she gets along well with her peers and adults. (R. at 721–27). K.S. also testified that she likes to socialize with friends after school. (R. at 484).

## B. Procedural History

On December 14, 2010, Plaintiff filed an application for SSI on behalf of her daughter, K.S., based on K.S.'s diagnosis of ADHD in 2006. (R. at 104–05). The Commissioner determined that K.S. was not disabled and denied Plaintiff's application. (R. at 109). On April 18, 2011,

Plaintiff filed for reconsideration of the Commissioner's determination, and her application was again denied. (R. at 112, 119). Plaintiff then requested a hearing before ALJ O'Leary, which was held on January 24, 2013. (R. at 167). Following the hearing, ALJ O'Leary issued a decision on February 1, 2013 denying Plaintiff's application for SSI. (R. at 5–21). Plaintiff sought review of ALJ O'Leary's decision by the Appeals Council. The Appeals Council denied Plaintiff's request for appeal. (R. at 1–4).

Plaintiff then filed a complaint with this Court, seeking judicial review of the Commissioner's final decision. *K.K. ex rel. K.S. v. Colvin*, No. 14-4236 (D.N.J. July 3, 2014), ECF No. 1. Judge John Michael Vasquez remanded the case to the Commissioner, stating that ALJ O'Leary's decision "did not permit meaningful judicial review and is not supported by substantial evidence." (R. at 513). Judge Vasquez noted that ALJ O'Leary "did not address (either accept or reject and articulate reasoning for doing so) the full battery of IQ tests administered by the consultative examiner in the ALJ's decision for purposes of whether [K.S.] met Listing 112.05."[2] (R. at 513). Judge Vasquez directed ALJ O'Leary to consider that full battery of IQ tests in light of Listing 112.00D(9), which states that in "cases where more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with listing 112.05." (R. at 513–14). Judge Vasquez also stated that ALJ O'Leary "did not adequately address the impact of K.S.'s structured setting, as required by 20 C.F.R. § 416.924a(b)(5)(iv), in his [functional

---

[2] 20 C.F.R. §§ 416.924a, 416.925, 416.926, 416.926a, and 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 111.00 112.00 were amended effective March 27, 2017; however these amendments have no substantive impact on the Court's analysis or on remand. *See* 81 Fed. Reg. 66138 at n.1 (Sept. 26, 2016) ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions. If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand.").

equivalence] analysis of the domain of Acquiring and Using Information and the domain of Attending and Completing Tasks." (R. at 514).

On remand, ALJ O'Leary granted Plaintiff another hearing, which he held on September 29, 2016. (R. at 448). On November 30, 2016, ALJ O'Leary issued a second decision denying Plaintiff's application for SSI. (R. at 425–447). This decision became the final decision of the Commissioner, as Plaintiff did not file written exceptions to the Appeals Council within 60 days. (R. at 426). Plaintiff now seeks federal judicial review of ALJ O'Leary's second decision denying her SSI.

## II. STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's decision if it is supported by "substantial evidence." 42 U.S.C. § 405(g); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. § 1383(c)(3). Substantial evidence is "more than a mere scintilla . . . but may be less than a preponderance." *Woody v. Sec'y of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988). It "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Not all evidence is considered substantial. For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence— particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to

support his ultimate conclusions. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). It does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986)). "[T]he district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)). A court must nevertheless "review the evidence in its totality," and "take into account whatever in the record fairly detracts from its weight." *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted).

In doing so, a court must assess whether the ALJ, when confronted with conflicting evidence, "specifically identif[ied] and explain[ed] what evidence he found not credible and why he found it not credible." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citing *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)). If the ALJ fails to properly indicate why evidence was discredited or rejected, the Court cannot determine whether the evidence was discredited or simply ignored. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

### III. APPLICABLE LAW

"In order to determine whether a child is disabled, the [ALJ] considers all relevant evidence including medical evidence, test scores, school records, and information from people who know the child and can provide evidence about functioning—such as the child's parents, care givers, and

teachers." *Ortiz v. Colvin*, No. CV 14-4805, 2016 WL 164995, at *1 (D.N.J. Jan. 14, 2016) (quoting *Misavage v. Barnhart*, No. 01-1764, 2001 U.S. Dist. Lexis 23329, at *16 (E.D. Pa. Nov. 30, 2001)).

The Social Security Administration must determine that the following three factors are satisfied before determining that a child is disabled:

(1) that the child is not working;

(2) that the child had a "severe" impairment or combination of impairments; and

(3) that the impairment, or combination of impairments, was of Listing-level severity, meaning the impairment(s) met, medically equaled or functionally equaled the severity of an impairment in the Listings.

*T.C. ex rel. Z.C. v. Comm'r of Soc. Sec.*, 497 F. App'x 158, 160 (3d Cir. 2012) (citing 20 C.F.R. § 416.924(a)). The Listings referred to in step three for child disability determinations are found at 20 C.F.R. § 404, Subpart P, Appendix 1.

"To determine whether a child's impairment(s) are medically or functionally equal in severity to an impairment contained in the Listings, the Commissioner assesses all functional limitations caused by the child's impairment(s)." *Pallens v. Colvin*, No. 13-7350, 2015 WL 6502100, at *2 (D.N.J. Oct. 26, 2015) (citing 20 C.F.R. § 416.926a(a)). "To determine whether a child's impairment(s) are functionally equivalent to listed impairments, the Commissioner evaluates the effect of the child's impairment(s) in six domains of functioning." *Id.* (citing 20 C.F.R. § 416.926a(b)(1)). These six domains are:

(1) Acquiring and using information;

(2) Attending and completing tasks;

(3) Interacting and relating with others;

(4) Moving about and manipulating objects;

(5) Caring for oneself; and

(6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)–(vi) (2016). To functionally equal a listing, the child's impairment must result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a) (2016).

## IV. ANALYSIS

In his decision, ALJ O'Leary found that K.S. has not engaged in substantial gainful activity since Plaintiff applied for SSI, that K.S. has the severe impairment of a learning disorder, but that her impairment or combination of impairments does not meet, medically, or functionally equal the severity of any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. at 431–42).

Plaintiff argues that ALJ O'Leary's second decision is subject to several fatal flaws: (1) the ALJ erred in failing to comply with Judge Vasquez's remand order in rendering a conclusory determination beyond judicial review as to whether K.S. meets the requirements of Listing 112.05; (2) the ALJ erred in failing to comply with Judge Vasquez's remand order in failing to adequately assess the effect of K.S.'s structured setting on her ability to function; (3) the ALJ ignored or disregarded relevant school records and other educational evidence; (4) the ALJ rendered a conclusory determination beyond judicial review in his functional equivalence analysis; and (5) the AJL did not adequately explain his decision to discount other relevant, material evidence. (ECF No. 11 at 14–44). The Court will address these arguments in turn.

### A. The ALJ's Determination as to Listing 112.05

Judge Vasquez directed ALJ O'Leary to analyze whether K.S. met Listing 112.05—intellectual disability—specifically in light of the directions provided in Listing 112.00D(9), which

stated "[i]n cases where more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with listing 112.05." (R. at 513–14).

Plaintiff claims that K.S. meets the requirements of Listing 112.05, subparts (A), (C), (D), and (F). (ECF No. 11 at 16). Subparts (C) and (D) state that a child meets Listing 112.05 if the child has a "valid verbal, performance, or full scale IQ of 59 or less" or if the child has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05(C), (D) (2016). Plaintiff argues that the ALJ erred by not crediting the scores K.S. received on a 2011 IQ test administered by Dr. Fulford. (ECF No. 11 at 16). On that test, K.S. received scores of 53, 55, 59, and 68 in the categories of verbal comprehension, perceptual reasoning, working memory, and processing speed, respectively. (R. at 368). K.S. also received a full scale IQ score of 49, indicating "moderate mental retardation." (R. at 368).

ALJ O'Leary did not afford the scores from Dr. Fulford significant weight. He argued that those results seemed abnormally low given K.S.'s results on two other IQ tests administered in 2009 and 2016. (R. at 435). He also noted that Dr. Fulford himself thought K.S.'s full scale IQ score might have been artificially lowered by a specific learning disability. (R. at 435). ALJ O'Leary further noted that Dr. Fulford's scores were inconsistent with other evidence in the record, including hospital treating notes, IEPs, school records, and Plaintiff and K.S.'s own testimony. (R. at 434–36). Judge Vasquez's remand order directed ALJ O'Leary to address why he discounted the non-full scale IQ scores from Dr. Fulford's test, and he has adequately done so here. *See Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003) (noting that the ALJ is not required to accept a claimant's IQ scores when they are inconsistent with other substantial evidence in the record).

11

Thus, ALJ O'Leary's determination that K.S. does not meet Listing 112.05(C) and (D) is supported by substantial evidence.

The ALJ's opinion does not adequately discuss Listing 112.05(A) and (F). Under Listing 112.05(A), a child aged three to 18 meets the required level of severity when his or her disability results "in at least two of the appropriate age-group criteria in" Listing 112.02B2. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05(A) (2016). The age-group criteria in Listing 112.02B2 include marked impairment in age-appropriate cognitive/communicative function, social functioning, or personal functioning, or marked difficulties in maintaining concentration, persistence, or pace. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.02B2a–d (2016). Under Listing 112.05(F), a child aged three to 18 meets the required level of severity when his or her disability results in the "satisfaction of 112.02B2a, and a physical or other mental impairment imposing an additional and significant limitation of function" is present. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05(F) (2016). Listing 112.02B2a is the "[m]arked impairment in age-appropriate cognitive/communicative function."

ALJ O'Leary's second opinion dedicates one sentence to an analysis of whether K.S. meets Listing 112.05(A) or (F). He writes, "the claimant does not have any other impairments that imposes [sic] significant limitations which results [sic] in a marked impairment regarding age appropriate social or personal functioning and/or that results [sic] in marked difficulties with maintaining concentration, persistence or pace." (R. at 431). In analyzing whether K.S. meets Listing 112.11 for ADHD, he similarly writes "[t]he evidence does not demonstrate findings of marked inattention, marked impulsiveness and marked hyperactivity or establish marked impairment or difficulties in two of the following: age-appropriate cognitive/communicative function; age-appropriate social functioning; age-appropriate personal functioning; or maintaining concentration, persistence or pace." (R. at 431). It is impossible for this Court to determine how

ALJ O'Leary came to his conclusions regarding Listings 112.11 and 112.05(A) and (F) given how detached his determinations are from any detailed exploration of the record found, which is only found in his functional equivalence analysis. Thus, ALJ O'Leary's findings regarding Listings 112.11 and 112.05(A) and (F) are beyond meaningful judicial review and this Court will vacate the ALJ's decision with respect to these findings and remand the case "for a discussion of the evidence and an explanation of reasoning supporting a determination" that K.S. does not meet the aforementioned Listings. *Burnett*, 220 F.3d at 120. On remand, the ALJ, in coming to his conclusion, should set out specifically what evidence indicates that K.S. does or does not meet each element required under Listings 112.11 and 112.05(A) and (F), including the categories set forth in Listing 112.02B2.

### B. The ALJ's Consideration of K.S.'s Structured Setting

In his remand order, Judge Vasquez concluded that ALJ O'Leary "did not adequately address the impact of K.S's structured setting, as required by 20 C.F.R. § 416.924a(b)(5)(iv), in his analysis of the domain of Acquiring and Using Information and the domain of Attending and Completing Tasks." (R. at 514). Judge Vasquez specifically noted that the ALJ's analysis would need to comply with 20 C.F.R. § 416.924a(b)(iv)(E), which instructs the ALJ to consider how well a claimant is functioning in a structured setting and the nature of that setting, among other factors, such as the amount of help the claimant requires from those around her and how a claimant would function outside the structured setting. (R. at 514).

Plaintiff correctly points out that ALJ O'Leary failed to take into account K.S.'s structured setting as required by Judge Vasquez's remand order. While the ALJ does note that K.S. is in more "mainstream" classes than she was as a younger student, (R. at 435), he does not analyze how K.S.'s continued special education support might be a factor in her progression, nor does he

13

assess how K.S. might perform outside of a structured setting. For example, ALJ O'Leary states that K.S. is maintaining a B grade average, but he does not evaluate how her structured setting might be affecting her grades beyond highlighting that K.S. receives "special education in about forty percent of her classes." (R. at 435). This type of superficial analysis is not sufficient. *See Coleman v. Comm'r of Soc. Sec.*, No. 15–6484 (RBK), 2016 WL 4212102, at *5–6 (D.N.J. Aug. 9, 2016) (remanding where ALJ noted claimant's grades and in-class support, but made no findings as to claimant's need for the structured setting or how claimant would function without the structured setting); *A.B. ex rel. Y.F. v. Colvin*, 166 F. Supp. 3d 512, 520 (D.N.J. 2016) (remanding where ALJ "neglected to consider the nature and extent of [claimant's] structured setting, the limitations in functioning he exhibits despite his placement in a sheltered environment, and how he would function if he did not have these support services"). ALJ O'Leary's analysis of the impact of K.S.'s structured setting in the domains of Acquiring and Using Information and Attending and Completing Tasks fails to follow the directions outlined in Judge Vasquez's remand order, and his failure to properly assess K.S.'s structured setting requires remand. On remand, the ALJ is to follow Judge Vasquez's remand order and the instructions herein as required by 20 C.F.R. § 416.924a(b)(iv)(E).

Additionally, "before the ALJ can make a finding of 'less than marked' in each of the six domains of functional equivalence, he must consider the extent to which the child's improvements are a result of the supportive services of his special education setting, and the extent to which those improvements are sustainable outside of that structured setting." *A.B. ex rel. Y.F.*, 166 F. Supp. 3d at 520–21; *see also Brown v. Colvin*, 193 F. Supp. 3d 460, 466 (E.D. Pa. 2016) ("A finding of 'less than marked' is unsupported by substantial evidence when the ALJ fails to consider that the child's improvements in behavior occurred only in the structured special education setting.")

(citation omitted). ALJ O'Leary's findings in his six-category functional equivalence analysis are thus unsupported by substantial evidence, because he failed to consider how K.S. would function outside her structured setting and how her structured setting contributed to her improvement.

### C. The ALJ's Development of and Analysis of the Record

Plaintiff's remaining objections to ALJ O'Leary's second decision concern his development of and analysis of the evidence in the record. Specifically, Plaintiff claims that the ALJ violated 20 C.F.R. § 416.924a(b)(7)(ii) by ignoring relevant educational records, that the ALJ's functional equivalence analysis was deficient, and that the ALJ did not properly evaluate Plaintiff and K.S.'s testimony and Dr. Slyker's psychological examination. (ECF No. 11 at 19–43).

20 C.F.R. § 416.924a(b)(7)(ii) mandates that the ALJ consider all the evidence in the record from the claimant's schools. The record contains much of this material, including: IEPs from December of 2009, December of 2010, May of 2012, May of 2013, May of 2014, April of 2015, and March of 2016; a functional assessment from March of 2015; a PARCC Assessment Report for the 2015-2016 school year; a learning disability report from 2009, and a teacher questionnaire from 2010. (R. at 220–28, 290–96, 305–32, 349–64, 377–97, 635–36, 637–740). In his decision, ALJ O'Leary substantively discusses the December 2010, May 2012, and March 2016 IEPs, the March 2015 functional assessment, the 2010 teacher questionnaire, and, to a limited extent, the 2009 disability report. (R. at 433–42). The Social Security Administration argues that ALJ O'Leary need not have discussed every piece of educational evidence in the record because the IEPs show K.S.'s "continued progress." (ECF No. 12 at 20). However, as discussed below, K.S.'s IEPs arguably show regression. Furthermore, the 2015 PARCC Assessment Report shows that K.S. scored well below grade level on the exam, and her functional assessment from 2015 showed

that Katrina placed in the "Very Low," "Low," or "Low-average" ranges across 10 of 12 possible scores. (R. at 635–36). In referencing the teacher questionnaire, ALJ O'Leary concludes that K.S. had no significant problems in the areas of "social functioning, physical functioning, self-care or health," (R. at 433), but he ignores that the same questionnaire shows serious or very serious problems in the areas of acquiring and using information and attending and completing tasks, (R. at 222–23). The record before this Court appears mixed, and ALJ O'Leary has not adequately evaluated all the evidence under 20 C.F.R. § 416.924a(b)(7)(ii). On remand, the ALJ is to analyze this evidence in the context of the overall record and provide meaningful analysis such that this Court would be able to determine why the ALJ discredited or gave weight to such evidence and how this evidence factors into the ALJ's decision that K.S. is eligible or ineligible for SSI. *See Correa ex rel. Correa v. Comm'r of Soc. Sec.*, 381 F. Supp. 2d 386, 395 (D.N.J. 2004) ("[i]n making his decision, the ALJ must consider all evidence [and] . . . must also note which evidence he rejects and provide reasons for the rejection.") (citations omitted).

ALJ O'Leary makes equally obtuse credibility determinations throughout his analysis. One stark example is the most recent psychological examination by consultative examiner Dr. Jonathan Slyker. Dr. Slyker administered K.S. an IQ test, which resulted in a full scale IQ score of 76, a verbal IQ score of 71, and a non-verbal IQ score of 83. (R. at 743). Dr. Slyker noted that K.S.'s mental status was "characterized by extremely restricted affect, minimal spontaneous narration of her own experience, extreme underconfidence and underassociation, minimal ability to reflect on verbal concepts, and speech that is empty and unresponsive to questions." (R. at. 744). Dr. Slyker concluded that K.S. has marked to severe deficiencies in "social skills, interpersonal communication, stress tolerance, task persistence and engagement, verbal communication for practical purposes, written communication, arithmetic calculation, and factual

knowledge," and further concluded that K.S. had marked limitations in the domain of Acquiring and Using Information and extreme limitations in the domains of Interacting and Relating with Others, Attending and Completing Tasks, and Caring for Oneself. (R. at 744, 752–755). ALJ O'Leary discusses all of this. (R. at 434–35).

Notably absent from his discussion though are some of Dr. Slyker's other opinions, such as where he concludes that K.S. "is exquisitely vulnerable to exploitation, manipulation, and actual physical harm, given her current infantile level of maturity . . . [and that she] requires both a law guardian to help her represent her own interests generally in life, and also an individual to help her manage her money should she be awarded benefits." (R. at 744). Dr. Slyker finishes his assessment by noting that assessments of K.S.'s academic achievements were "likely grossly inflated," which ALJ O'Leary also left out of his opinion. ALJ O'Leary's provides the Court with no basis by which to evaluate why he discounted Dr. Slyker's conclusions or chose not to include certain of his opinions. While ALJ O'Leary lists other pieces of evidence that support his conclusion that K.S. is not disabled, such as school records reporting that K.S. is "'a very nice girl' with 'wonderful behavior,'" or the fact that she is maintaining a B grade average, (R. at 435), he does not provide the Court with any information as to why he affords those pieces of evidence more weight than Dr. Slyker's report. This is especially troubling considering the amount of evidence in the record in accord with Dr. Slyker's findings. "Where there is conflicting probative evidence in the record, [the Court] recognize[s] a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) (citing *Cotter*, 642 F.2d at 706); *see also Burnett*, 220 F.3d at 121 (remanding a case to the ALJ where he "fail[ed]

to consider and explain his reasons for discounting all of the pertinent evidence before him in making his" decision).

As mentioned above, while ALJ O'Leary's functional equivalence analysis is already deficient in that he failed to properly assess the impact of K.S.'s structured setting, *see supra* Part IV.B, it further suffers from a failure to appropriately assess the evidence in the record before him. His factual assessment for each functional equivalence domain consists of little more than a few short sentences. (R. at 437–42). Without knowing what evidence the ALJ afforded weight and why, the Court cannot properly review whether these assessments are supported by substantial evidence. For example, ALJ O'Leary determined that though K.S. "is below level in school," K.S. has "progressed" and is "expected to do well in the coming school year." (R. at 437). In coming to this conclusion, ALJ O'Leary cites to the 2009 disability report and the December 2010, May 2012, and March 2016 IEPs. (R. at 437). ALJ O'Leary notes that K.S.'s IEP from 2012 indeed showed improvement and that K.S. was doing quite well in school. (R. at 434). However, in the following paragraph, the ALJ discusses the March 2016 IEP, which notes that K.S. was, for example, having trouble working independently, was not doing her homework, and was copying the work of others. (R. at 434). The 2015 functional assessment that he discusses in that same paragraph shows K.S.'s "broad achievement scores ranged from Low/Low Average to Very Low." (R. at 434). Thus, the very evidence that the ALJ relies on in concluding that K.S. is progressing could also demonstrate regression. Yet ALJ O'Leary provides very little analysis that would allow this Court to discern why or how he came to the conclusion that K.S. was progressing in light of evidence to the contrary. Such an analysis is necessary when there is conflicting evidence in the record. *Zirnsak*, 777 F.3d at 612. Furthermore, ALJ O'Leary's conclusion in the domain of Acquiring and Using Information simultaneously states that K.S. "has a marked

limitation in acquiring and using information," *and* that K.S. "does not have any significant limitation in this domain." (R. at 437). Thus, ALJ O'Leary's functional equivalence analysis is beyond meaningful judicial review, and on remand the ALJ must address these deficiencies.

## V. **CONCLUSION**

For the aforementioned reasons, the Court vacates the ALJ's decision and remands the case to the Commissioner for further proceedings in accordance with the instructions herein and in the accompanying Order. An appropriate Order follows this Opinion.

DATED: March 27, 2018

JOSE L. LINARES
Chief Judge, United States District Court